Patrick J. McGroder III (002598)
Shannon L. Clark (019708)
Lincoln Combs (025080)
Caroline E. McGroder (030418)
Gallagher & Kennedy, P.A.
2575 East Camelback Road
Phoenix, Arizona 85016-9225
(602) 530-8000
(602) 530-8500 - Fax
pjm@gknet.com
slc@gknet.com
lincoln.combs@gknet.com
caroline.mcgroder@gknet.com
Attorneys for Plaintiffs

Thomas K. Kelly (012025)
Thomas K. Kelly, P.C.
425 East Gurley
Prescott, Arizona  86301
(928) 445-5484
tskelly@kellydefense.com
Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Juliann Ashcraft, et al.,<br><br>        Plaintiffs,<br><br>v.<br><br>State of Arizona, et al.,<br><br>        Defendants. | No. CV-14-2308-PHX-JJT<br><br>**RESPONSE TO MOTION TO DISMISS**<br><br>**(Oral Argument Requested)** |

Plaintiffs hereby respond to the State Defendants' Motion to Dismiss.  This response is supported by the following Memorandum of Points and Authorities, the exhibits attached, and the record in this case.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION, SUMMARY OF ARGUMENT AND BACKGROUND

This case arises from the tragic death of 19 members of the City of Prescott Fire Department's Granite Mountain Type One Interagency Hotshot Crew ("GMIH"). Plaintiffs' decedents were 12 members of the GMIH who perished while fighting the Yarnell Hill fire on June 30, 2013.  Plaintiffs initiated this lawsuit asserting state-law

wrongful death claims and actionable violation of rights protected by the federal constitution under 42 U.S.C. § 1983.

As described in the Amended Complaint, Defendants were grossly negligent and recklessly and deliberately indifferent to the safety of the Hotshots during their management of the response to the Yarnell fire.  Defendants violated applicable firefighting regulations, rules, and protocols expressly created to protect firefighters and minimize their risk of harm.  These gross violations of their duties of care owed to the Hotshots created an enormous risk of harm far beyond the normal risks of fighting forest fires, ultimately causing their deaths and violating the fundamental constitutional rights of the Hotshots and their loved ones.

Although the State did not pay GMIH crewmembers' salaries or provide workers' compensation benefits, it argues that it was Plaintiffs' decedents' employer and that it enjoys immunity from Plaintiffs' wrongful death claims on the basis of the workers' compensation exclusive remedy provisions. It also contends—without the benefit of any record development or discovery—that its employees' actions were insufficiently egregious to support Section 1983 liability.  The State's motion fails.

First, the conduct described in Plaintiffs' Amended Complaint and to be developed further in discovery supports § 1983 claims.  With respect to the wrongful death action, Plaintiffs' decedents were City of Prescott—not State of Arizona—employees and the Intergovernmental Agreement ("IGA") the State claims makes them *de facto* State employees is invalid.  Second, the State takes the position it is *not* the employer in a separate proceeding related to this case.  This admission estops it's employer claims here, and the "lent employee" doctrine cannot resuscitate them.  Absent an employer-employee relationship, the State's worker's compensation exclusive remedy arguments fail and, at most, questions of fact preclude dismissal at this stage.

Third, even if the Hotshots were considered State employees—they are not—the State's willful misconduct defeats the worker's compensation exclusive remedy

2

provisions.  Finally, because Defendants were not responsible for the lightning that started the Yarnell Hill Fire in June 2013, the State's Firefighter's Rule defense fails.

At a minimum, the Court should defer consideration of the State's motion for 120 days so that the limited discovery outlined in Section II(E), *infra*, can be completed and the record supplemented on the issues outlined below.  *See* Fed. R. Civ. P. 56(d).

## II.    ANALYSIS

### A.    Standard of Review

The State Defendants' motion is brought under Rule 12(b)(1) and (6), Fed. R. Civ. P.  As such, all the facts alleged in the Amended Complaint are presumed true, and all reasonable inferences to be drawn from those facts are drawn in Plaintiffs' favor.  *See, e.g.*, *Cervantes v. United States*, 330 F.3d 1186, 1187 (9th Cir. 2003).

The State Defendants' arguments in favor of dismissal disregards this heavy burden at the motion to dismiss stage, asking this Court instead to presume facts and inferences in their favor.  Such an approach is inappropriate before Plaintiffs have had any opportunity to conduct discovery and develop a factual record.  This is particularly the case for the State Defendants' arguments that they have qualified immunity to Plaintiffs' claims under 42 U.S.C. § 1983.  Motions for summary judgment under Rule 56 are the more appropriate vehicle for adjudicating fact-intensive qualified immunity claims like those here.  *See Hernandez v. Ryan*, 2010 WL 4537975, at *1 (D. Ariz. Nov. 3, 2010) (noting "difficult position" of court reviewing motion to dismiss on qualified immunity grounds and stating that "it is not necessarily advisable" for defendants to bring such motions (citing *Kwai Fun Wong v. United States*, 373 F.3d 952, 957 (9th Cir. 2004)).

The State Defendants attach various affidavits and documents as exhibits to their motion, which converts their motion from Rule 12 to Rule 56.  But this is the State Defendants' attempt to have it both ways: to get rulings based at least in part on factual questions where they have access to all the evidence and Plaintiffs have not had an opportunity to conduct discovery.  This is thus not a true Rule 56 motion where the facts

3

1    are fully vetted.  Plaintiffs attach the published reports on the Yarnell Fire tragedy to rebut
2    the State Defendants' factual assertions, but reiterate that the Rule 12 standard still applies
3    to the Court's consideration of the motion and that all facts and inferences drawn from
4    those facts must be found in Plaintiffs' favor.

5        **B.    Plaintiffs Have Alleged Valid § 1983 Claims and Defendants Hall and
6             Shumate are not Entitled to Qualified Immunity**

7            Plaintiffs allege that Defendants Hall and Shumate violated the Fourteenth
8    Amendment rights of their decedents and Plaintiffs' own Fourteenth and First[1]
9    Amendment rights to continue to associate with their fathers, sons, or husbands.  In
10   response, the State Defendants argue in their motion that Defendants Hall and Shumate
11   are entitled to qualified immunity, that Plaintiffs have not sufficiently alleged state-created
12   danger claims under Ninth Circuit law, and that Plaintiffs are not proper parties to bring §
13   1983 claims for the deaths of their loved ones.  These arguments fail.

14       **1.    The *Saucier* Test for Evaluating Constitutional Claims and the
15            Qualified Immunity Defense**

16           Qualified immunity is an affirmative defense.  *Crawford-El v. Britton*, 523 U.S.
17   574, 586-587 (1998).  In *Saucier v. Katz*, 533 U.S. 194, 201 (2001), the Supreme Court
18   articulated the two-step analysis for evaluating a qualified immunity defense to a § 1983
19   claim.  The "constitutional inquiry" asks whether, when taken in the light most favorable
20   to the non-moving party, the facts alleged show that the official's conduct violated a

21   _____

22   [1]   The State Defendants argue that the right of familial association arises only out of the
23   Fourteenth and not the First Amendments.  While the right of familial and intimate
     association has been recognized as arising out of the First Amendment as well as other
24   constitutional provisions, *see, e.g.*, *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 57
     (2d Cir. 2014) (citing *Roberts v. United States Jaycees*, 468 U.S. 609, 104 S. Ct. 3244, 82
25   L.Ed.2d 462 (1984)), for purposes of this motion Plaintiffs will not dispute the State
26   Defendants' arguments in Section IV.D. of their motion that Plaintiffs' claims arise out of
     the Fourteenth Amendment and not the First, *see Kelson v. City of Springfield*, 767 F.2d
27   651, 654-55 (9th Cir. 1985).

28
                                             4

constitutional right.  *Id.*  If so, a court should turn to the "qualified immunity inquiry" and ask if the right was clearly established at the relevant time.[2]  *Id.* at 201-02; *see also Moss v. U.S. Secret Serv.*, 711 F.3d 941, 957 (9th Cir. 2013) (summarizing qualified immunity test).

The "constitutional inquiry" in this case revolves around Plaintiffs' claim that the State Defendants violated the substantive due process rights of the Granite Mountain Hotshots by increasing their risk of serious harm.  *See, e.g.*, Am. Compl. ¶¶ 57-64, 76-77. The Constitution and specifically substantive due process protects a citizen's liberty interest in his or her own bodily security.  *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1061 (9th Cir. 2006).  When state action creates or aggravates a risk of harm that violates that liberty interest, the state actor incurs § 1983 liability.  *Id.* at 1061-62.

There are two elements to the "state-created danger" claim in the Ninth Circuit: whether the defendants' conduct created or increased the danger to the victim, and whether the defendants acted with "deliberate indifference" to the risk to the victim in doing so.  *Id.* at 1062-64; *Penilla v. City of Huntington Park*, 115 F.3d 707, 709-10 (9th Cir. 1997).[3]  *L.W. v. Grubbs*, 974 F.2d 119 (9th Cir. 1992), is an early example of the analysis of a state-created danger claim in this circuit, under facts analogous to the instant case.  In *Grubbs*, a nurse working at a prison was assaulted and raped by an inmate who the defendant prison officials had assigned to her despite a history of sexual violence.  *Id.* at 120.  The district court granted the defendants' motion to dismiss, but the Ninth Circuit

---

[2]  These two steps can be taken in either order at the reviewing court's discretion. *Pearson v. Callahan*, 555 U.S. 223, 241-42 (2009).

[3]  *Penilla* also emphasized that the "indeterminate line between danger creation and enhancement" was not part of the qualified immunity analysis; it makes no difference whether the defendants created the risk of harm or merely aggravated it.  *Id.* at 710.

reversed, finding that the plaintiff had successfully alleged affirmative actions of unconstitutional conduct by the defendants.[4][5]  *Id.*

The *Saucier* "qualified immunity inquiry," i.e., whether the right violated was clearly established at the time of the violation, is resolved by evaluating whether or not "a reasonable public officer could have believed that the alleged conduct was lawful." *Jensen v. City of Oxnard*, 145 F.3d 1078, 1085 (9th Cir. 1998).  Plaintiffs do not have to show that "the very act in question has previously been held unlawful," defendants "can still be on notice that their conduct violates established law even in novel factual circumstances."  *Hope v. Pelzer*, 536 U.S. 730, 739, 741 (2002).  What matters is that "a reasonable official would understand that what he is doing violates" a constitutional right. *Kennedy*, 439 F.3d at 1065.

### 2.  Plaintiffs Have Alleged a State-Created Danger Claim Under Ninth Circuit Law

#### a.  Hall's and Shumate's Affirmative Actions Increased the Danger to the Hotshots as Well as Created Entirely New Dangers

Plaintiffs' Complaint is forced to at times speak in generalities for the obvious reason that their investigation is in its infancy and they have not yet had an opportunity to conduct discovery into what exactly happened on June 30, 2013.  But because the State Defendants have both attacked the specificity of Plaintiffs' allegations under *Iqbal/Twombly* and given their self-serving version of the facts in their motion, Plaintiffs

---

[4]   The court also rejected an argument the State Defendants make here, that because the unconstitutional misconduct occurred in a work environment there can be no liability.  *Id.*
[5]   The plaintiff in *L.W.* proceeded to trial and won a substantial verdict that was subsequently thrown out by the Ninth Circuit in a second appeal.  *L.W. v. Grubbs (Grubbs II)*, 92 F.3d 894 (1996).  *Grubbs II* bolsters Plaintiffs' position because it demonstrates the distinction between pleading unconstitutional wrongdoing and proving it.  Plaintiffs understand that at trial they need to prove deliberate indifference or their § 1983 claims will fail like the plaintiff's in *Grubbs II*.  But for purposes of a motion to dismiss under Rule 12(b)(6), Plaintiffs have pled enough to defeat the motion and proceed to discovery.

herein further detail Defendants Hall's and Shumate's affirmative actions that aggravated and created the deadly danger to the Hotshots.  These further detailed allegations come from the two public investigative reports on the Yarnell Fire published by the Arizona State Forestry Division and the Division of Occupational Safety and Health of the Industrial Commission of Arizona ("ADOSH"), attached to this response at Exhibits A and B,[6] respectively, and media accounts including an *Arizona Republic* news article which summarizes interview notes that were not published in the Forestry Division report, enclosed at Exhibit C.  Comparison of these reports demonstrates a vast disparity in reported "facts" and the importance of allowing discovery into these issues, not only to respect the litigation truth-seeking process but also to get much-needed answers for a grieving community.

     **i.**  **Published facts as to Hall's and Shumate's actions which Plaintiffs seek to add to their Complaint as necessary**

  The allegations in this subsection against Defendants Hall and Shumate are public knowledge based on the enclosed reports and published media accounts.  Although many of these allegations are already described in Plaintiffs' Complaint, *see* Am. Compl. ¶¶ 57-64, 76-77, to the extent that the Court believes these allegations must be more fully detailed in Plaintiffs' Complaint to survive the State Defendants' motion, Plaintiffs request leave under Rule 15, Fed. R. Civ. P., to so amend their pleading.  *See Mazzeo v. Gibbons*, 649 F. Supp. 2d 1182, 1191 (D. Nev. 2009) (granting leave to file second amended complaint under Rule 15(a) in § 1983 case in response to motion to dismiss because justice so required).[7]

---

[6] Ex. B also includes the Wildland Fire Associates report commissioned by ADOSH.
[7] Plaintiffs will file a formal motion to amend their Amended Complaint in the immediate future.

In late June 2013, conditions were perfectly aligned for a massive and potentially deadly forest fire in the Yarnell area. Ex. B. Arizona was in a massive drought, humidity was extremely low, and the heat was intense. *Id.* Temperatures in the Phoenix area soared to 116 degrees on the weekend of June 28-30. *Id.* The town of Yarnell was located in chaparral scrubland that had not burned in at least 40 years, and the 2013 Arizona Fire Season Outlook concluded that the Yarnell area had high fire potential. *Id.* There were also storms in the area that could both start a major forest fire with lightning and fan the flames into a monster conflagration with severe winds. *Id.* In a media interview months later, Defendant Hall acknowledged how dangerous the situation was when he initially learned of the Yarnell Fire:

> "My first thoughts were, 'We've talked about Yarnell Hill since the 1970s.' It's explosive. It's very, very dangerous," he said. "And the last week in June is the most condemning for fire activity in Arizona."

Dennis Wagner, Commander Reflects on Yarnell tragedy, *Ariz. Republic*, Oct. 4, 2013, *available at* http://www.azcentral.com/news/articles/20131002yarnell-hill-fire-report-commander.html (last accessed Nov. 24, 2014).

The Yarnell Fire started on June 28, 2013, with a lightning strike at approximately 5:00 p.m. Ex. A; Ex. B; Am. Compl. ¶ 37. Defendant Shumate traveled to Yarnell that evening but did not personally view the fire. Ex. B.; Am. Compl. ¶ 39. By 7:40 that night he had been named Incident Commander Level 4, but decided to take no action to fight the fire until the morning. Ex. B. The fire at that time covered about one acre. *Id.*

By the next morning, June 29, because Shumate had affirmatively chosen not to initiate any firefighting measures whatsoever, the fire had spread to approximately eight acres. Ex. B; Am. Compl. ¶ 40. Shumate developed an attack plan using a small firefighting crew and tanker air support. Ex. B. Those measures worked for a time and the fire was reduced to two acres. *Id.* Shumate overreacted and released the air support and made plans to release other ground units. *Id.* But a weather alert at 3:00 p.m. warned of increasing storm activity that afternoon as is typical for that area and time of year. *Id.*

8

Although the storms could bring much-needed rain, they also would mean potentially high winds which could spread the fire. *Id.* Despite the weather warning, Shumate continued his plans to release firefighters from active duty. *Id.*; Am. Compl. ¶ 43-46. By the time he realized his error and ordered the ground support and air tankers to return to the area, it was too late. Ex. B; Am. Compl. ¶ 43. The fire had jumped a road barrier and was rapidly spreading. Ex. B. It grew to six acres by 5:30, but Shumate declined additional air support of a Very Large Air Tanker. Ex. B; Am. Compl. ¶ 46.

Over the next two hours, Defendant Shumate completely lost control of the Yarnell fire and it grew exponentially. Ex. B; Am. Compl. ¶ 47. By 7:38 p.m., it had grown to an estimated 100 acres and approaching structures in Yarnell and Peeples Valley. *Id.* Forestry officials planned to send a larger and more experienced management team led by Defendant Hall. Ex. B; Am. Compl. ¶ 48.

One theme throughout Hall's and Shumate's management of the Yarnell firefighting effort is prioritizing protecting structures in the nearby towns over firefighter safety. Ex. B; Am. Compl. ¶ 76. That is reflected in both of their priorities in their affirmative management decisions. *Id.* When additional management support began to arrive at the scene of the fire, Shumate assigned them to review danger to structures but failed to comply with Arizona law and Forest Service policy requiring appointment of safety officers and performing risk analyses. Ex. B; Am. Compl. ¶ 57, 76. Similarly, when Hall took over command from Shumate on the morning of June 30 he took an aggressive, direct firefighting tactical approach to protect nearby structures while consciously choosing not to appoint required safety officials or perform required safety and risk assessments. Ex. B; Am. Compl. ¶ 57, 60, 76.

The transition between the two commanders and briefing of the various firefighting teams responding to the fire including the Granite Mountain Hotshots was confused and sporadic. Ex. B; Ex. C; Am. Compl. ¶ 58, 76. Many of the team commanders – including Hotshots superintendent Eric Marsh – were not present for the briefing at 9:30 a.m. on

9

June 30.  Ex. B.  Once again the priority at the briefing was to address risk to structures, and Hall consciously choose to minimize and deprioritize the risks to the firefighters he commanded.  Ex. B; Ex. C; Am. Compl. ¶ 60, 76.  Hall completed the transfer of command from Shumate by 10:22 a.m. without appointing a Safety Officer as required by Forestry Department protocols.  Ex. B; Am. Compl. ¶ 57, 76.  Two Safety Officer positions would eventually be filled later that day minutes after the Hotshots had perished.  Ex. B.

There were warning signs that Hall's and Shumate's management decision to prioritize structure protection and overall lack of organization and leadership was jeopardizing firefighter safety early on June 30.  At 11:00 a.m., a structure protection supervisor called for the evacuation of crews working at the Double Bar A Ranch.  Ex. B.  Despite the risks, structure protection crews continued to work at the Ranch.  *Id.*  Those crews had to make an emergency evacuation a few hours later.  *Id.*  And the confusion from the lack of coherent management effort consistent with Arizona law and Forestry policies began to directly affect the Hotshots.  Ex. B; Am. Compl. ¶ 58, 76.  Marsh and his team were engaged in indirect firefighting activities with a controlled burn when— because of poor communications with air support—a tanker dropped retardant directly on their location, extinguishing their controlled fire.  Ex. B.  After their indirect firefighting efforts had been squashed by their own air support, the Hotshots were ordered by Hall's commanders to resume direct firefighting efforts, eventually moving to a ridge overlooking the fire to observe the situation and plan their next move.  Ex. B.

At about 1:00 p.m. on June 30, 2013, instead of working out the command control and cooperation problems with the two ground divisions combatting the Yarnell Hill Fire, the Division Zulu Supervisor simply left the fire line, drove to the incident command post, and never returned to the ground division he was supposed to supervise.  Ex. B; Ex. C.

Throughout the day the weather worsened and the fire grew more active and unpredictable.  Ex. B.  At 2:02 p.m., Hall and the other commanders received a weather

report that thunderstorms were approaching with winds up to 45 miles per hour.  *Id.*  Hall continued to focus on structure prevention and avoided risk assessment.  Ex. B; Ex. C; Am. Compl. ¶ 39, 60, 76.

At about 3:58 p.m. on June 30, 2013, Air Tactical Group Supervisor Rory Collins left the firefighting effort without explanation or a proper turn-over and went back to his Deer Valley home.  Ex. B.  Collins had been in charge of the aerial water and retardant drops desperately needed to fight the fire and to protect the Granite Mountain Interagency Hotshot Crew.  *Id.*  The abandonment of his post left the firefighters without their final protection against death.  Ex. B;  Ex. C.

And the situation among the crews working the Yarnell Fire under Hall's command continued to deteriorate.  Ex. B; Ex. C; Am. Compl. ¶ 58-59, 76.  Members of another firefighter crew working near the Hotshots later told investigators that the overall operation was "total non-stop chaos" and "Swiss cheese" because it was so full of holes.  Ex. C.  They witnessed a near-miss between two aircraft responding to the fire, and described problems with radio communications and fighting between crew commanders.[8]  *Id.*  For their part, pilots described that they did not know which crews were fighting the fire, what the attack plan was, or where ground crews were assigned.  *Id.*  Some firefighters later said that they hadn't received crucial weather updates and the chief meteorologist assigned to the fire told investigators later that it was "relative chaos" among the various firefighting personnel.  *Id.*  As mentioned, at least two different

---

[8]    Allowing this matter to proceed to discovery could do significant public good as well by allowing the full story of what happened with the Yarnell Fire to become public knowledge to spur further changes to firefighting policy.  Key witnesses were not allowed by the federal government to be interviewed for the ADOSH investigation, and those witnesses' comments were not referenced in the Forestry Division's report.  These unanswered questions, compounded by redactions to reports and selective release of information and video footage, underscore the need to allow fair discovery in this matter.

firefighting leaders – one air unit and one ground commander – simply packed up and went home without telling anyone.  Ex. B; Ex. C.

By 3:30 p.m., the Hotshots were in a relatively safe location in a burned out "black" area on top of the ridge.  Ex. B.  At around that same time Hall and the other commanders received a weather update that the severe winds had changed course to the south and southwest.  *Id.*  It does not appear that this weather update was ever relayed by Hall to Marsh and the Hotshots.  *See* Ex. B; Ex. C; Am. Compl. ¶ 61.

At some point just before 4:00 p.m., Marsh had a conversation with another fire official under Hall's command about what their next plan should be.  Ex. B.  Some media accounts have described this conversation as an argument, and it is unclear exactly what the discussion focused on.  The ADOSH report does reference based on its interviews that Marsh described the winds in his area as "squirrely."  Ex. B; Ex. C.  Around this time, another team requested assistance protecting structures in Yarnell and the Hotshots were asked to assist.  Ex. B.  At 4:01 p.m., videotape partially-recorded a conversation between Marsh and another firefighter team supervisor in which Marsh says they are going to make their way down the ridge to a road below that led to the Yarnell area.  Ex. B; Ex. C.  At about 4:04 p.m., the Hotshots left the ridge and moved down the hillside.  Ex. B.

Less than half an hour later, the swirling winds had changed direction again and drove 40-foot tall waves of fire directly towards the Hotshots.  Ex. B.  At some point they tried to call for air support, but because of the chaos the air commanders thought the Hotshots were still safe on the ridge.  Ex. B; Ex. C.  An unnamed ground commander told them not to respond to the Hotshots' request, which could have saved their lives.  Ex. C.

The Hotshots were trapped by the advancing flames and made plans to do what they could to survive the advancing wall of fire.  Ex. B.  Marsh made a final radio call to Hall's headquarters indicating that their escape route had been cut off and they were deploying their shelters.  Ex. B; Ex. C.  The Hotshots were never heard from again.  They perished in the flames approximately 600 yards from the town of Yarnell.

The above-described "Willful Serious" misconduct, *see* Ex. B (finding multiple "Willful Serious" violations), of Defendants Hall and Shumate sufficiently describes a state-created danger claim under § 1983 in the Ninth Circuit.  But the published reports are incomplete and evidence describing what happened has only begun to trickle out into the public record.[9]  Discovery is likely to reveal additional instances of misconduct that further flesh out Plaintiffs' § 1983 claims.  *See* Am. Compl. ¶ 99.  For example, little is known about the specific communications between the Hotshots' commander Eric Marsh and Defendant Hall and the other firefighting commanders under Hall's leadership in the last few minutes of the Hotshots' lives.  Plaintiffs are entitled to discovery on this issue and the others described above to meet the State's defenses.[10]

> **b.**  **Hall's and Shumate's "Willful Serious" Violations of Arizona Law and Firefighting Policy Demonstrate Deliberate Indifference to the Danger to the Hotshots That Hall and Shumate Created and Aggravated**

Both Defendants Hall and Shumate acted to substantially increase the risk of harm to the firefighters under their command.  Contrary to Arizona law and firefighting policy and protocols, Defendants Hall and Shumate placed protection of structures ahead of firefighter safety and affirmatively chose not to comply with the other safety measures

---

[9]   Hours of video and audio recordings from the Yarnell Fire and Granite Mountain Hotshots were released in response to media requests as recently as November 9, 2014, and Plaintiffs have not yet had time to obtain, review, and digest these recordings to see if they provide a basis for additional allegations against the State Defendants including Hall and Shumate.  Other public record requests are pending and additional evidence exists which has not yet been made public which would shed light on how the Hotshots died and what the State Defendants did or knew that led to those deaths.

[10]   Plaintiffs would be willing to consider a limited discovery phase focused solely on qualified immunity (and "willful/serious" conduct), as has been suggested in some of the cases and treatises.  *See Lewis v. City of Ft. Collins*,  903 F.2d 752, 754 (10th Cir. 1990) (noting that in some cases discovery may be necessary to determine if defendants are entitled to qualified immunity but that initial discovery should be limited to resolving that issue).

those laws and policies imposed on firefighting commanders.  The Industrial Commission

applied the ADOSH findings and issued a massive fine against the Forestry Division for

the "Willful Serious" violations of Arizona law and Forestry policy and procedure that

jeopardized the lives of the firefighters under Hall's and Shumate's command.  The ICA

and ADOSH concluded that Hall, Shumate, and the Forestry Division:

- implemented suppression strategies that prioritized protection of non-defensible structures and pastureland over firefighter safety;

- failed to prioritize strategies consistent with Forestry Division policies and protocols;

- failed to order the removal of the Hotshots when leadership knew that the Hotshots were downwind of the fire and exposed to smoke inhalation, burns, and death;

- failed to evacuate the 31 members of the structure protection group at the Double Bar A Ranch before those firefighters were exposed to fire danger;

- failed to evacuate 30 other firefighters exposed to fire danger who were conducting indirect firefighting activities;

- violated A.R.S. § 23-403(A) by failing to provide a workplace free from hazards that could cause serious harm or death;

- failed to implement fire suppression plans consistent with A.R.S. § 37-623 and Forestry Division policy and protocols;

- failed to fill critical safety management positions as required by Forestry Division policy; and

- failed to properly manage firefighting efforts and implement required plans and assessments after the initial firefighting efforts failed and firefighting moved to an extended attack mode.

*See* Ex. B; Am. Compl. ¶¶ 76-77.  The ICA fined the Forestry Division $559,000 for these

violations, including a $25,000 fine for each of the 19 Hotshot deaths.

The violations found by ADOSH and the ICA demonstrate that Hall and Shumate

were not merely mistaken or negligent in their management of the Yarnell firefighting

14

effort.  Even just based on those published findings, it is clear that their management of the Yarnell fire was systematically erroneous because Hall and Shumate took the affirmative actions to prioritize structure protection over the safety of the firefighters under their command in violation of Arizona law and policy.

The State Defendants argue that Plaintiffs need to allege facts that "shock the conscience," to allege a state-created danger claim but this is not the test in the Ninth Circuit.  The "deliberate indifference" prong of the state-created danger analysis already incorporates this test.  *See A.D. v. Calif. Highway Patrol*, 712 F.3d 446, 453 (9th Cir. 2013) (noting that "[c]onscience-shocking actions are those taken with . . . deliberate indifference"); *see also Grubbs II*, 92 F.3d at 900 (rejecting conscience-shocking standard and holding that "such subjective epithets as 'gross,' 'reckless,' and 'shocking' sheds more heat than light" on the deliberate indifference inquiry).  Defendant Hall's and Shumate's systematic disregard of the safety of the Hotshots and other firefighters under their command is paradigmatic deliberate indifference and in the Ninth Circuit establishes a violation of the right to bodily integrity protected by substantive due process.[11] *Kennedy*, 439 F.3d at 1066; *Penilla*, 115 F.3d at 711.

> **3.     The Hotshots' Right to Be Free From State-Created Danger Was Clearly Established Long Before June 2013**

---

[11]   Allegations of far less culpable official conduct have proved sufficient to state a claim for violation of substantive due process.  *See Patrick v. Great Valley School Dist.*, No. 06-4270, 2008 WL 4516690, *2 (3d Cir. Oct. 9, 2008) (denying summary judgment on state-created danger theory for wrestling coach who matched plaintiff with much heavier opponent who injured plaintiff); *Pena v. DePrisco*, 432 F.3d 98, 111 (2d Cir. 2005) (finding that plaintiffs stated claim against officers who encouraged another officer to drive while intoxicated); *Robinson v. Township of Redford*, 48 Fed. Appx. 925, 929, 2002 WL 31398974, at *4 (6th Cir. 2002) (holding that plaintiffs were entitled to discovery to pursue claim that officers violated Constitution by incorrectly informing plaintiff that his business had been searched and was empty of dangerous intruders).

15

Clearly established law gave sufficient notice to Defendants Hall and Shumate that they were prohibited from conducting their management of the Yarnell firefighting effort so as to substantially increase the risk of death and serious bodily harm to the firefighters under their command.  The relevant inquiry is whether a reasonable firefighting official could have believed that their conduct was lawful.  *Anderson v. Creighton*, 483 U.S. 635, 636, 646-47 n.6 (1987) (holding that "it should first be determined whether the actions [taken by the defendant] are actions that a reasonable officer could have believed lawful" but if not then discovery is necessary to resolve qualified immunity issue).

Not only have state-created danger claims been well-established in the Ninth Circuit since the 1990s, *Kennedy*, 439 F.3d at 1066 (holding that it "is beyond dispute that [since] September 1998, it has been clearly established that state officials could be held liable where they affirmatively and with deliberate indifference placed an individual in danger []he would not otherwise have faced"), the "Willful Serious" violations of Arizona law and firefighting policy found by ADOSH demonstrate that no reasonable firefighting official could have believed that systematically—over a period of days—placing structure prevention ahead of firefighter safety could have been a lawful act.  Again, even before Plaintiffs have had the opportunity to conduct discovery, state investigators have already found that Hall and Shumate violated Arizona law and federal and state firefighting protocols and procedures.  Thus the State Defendants' arguments that it was "not clearly established" that what Hall and Shumate were doing violated the law and the Hotshots' and Plaintiffs' constitutional rights must fail.  *See Grubbs*, 974 F.2d at 120-22 (holding in 1992 that supervisor of workplace could be held liable under § 1983 for creating danger to worker in violation of worker's constitutional rights).

Despite the State Defendants' arguments, § 1983 plaintiffs do not have to find a factually similar case to show that their right to be free from state-created danger was clearly established.  *Hope*, 536 U.S. at 741 (holding that government officers' conduct constituting constitutional violation could be "clearly established" even if facts of earlier

16

case were not "materially similar" to current case); *see also Bilbrey by Bilbrey v. Brown*, 738 F.2d 1462, 1466 (9th Cir. 1984) (holding that basic constitutional rights of students had been sufficiently well-established that defendants were adequately on notice their actions were unconstitutional despite lack of "explicit rulings" addressing school searches).  The State Defendants argue that to be "clearly established" the constitutional claim must have been announced in an identical or nearly-identical factual scenario.  Requiring such a high level of specificity would provide much more than the "fair warning" contemplated by the qualified immunity defense, and the Ninth Circuit has repudiated this argument.[12]  *Moss v. United States Secret Service*, 675 F.3d 1213, 1228-29 (9th Cir. 2012) (rejecting defense argument "that because there are no cases with similar fact patterns" defendants could not have known their actions were unconstitutional); *Mendoza v. Block*, 27 F.3d 1357, 1361-62 (9th Cir. 1994) (rejecting defense argument that lack of prior case law on use of police dogs meant defendant officers had no notice of constitutional violation).  In *Moss*, for instance, the Court rejected qualified immunity because the general prohibition on viewpoint discrimination was clearly established.  675 F.3d at 1228-29 (holding that "decades of Supreme Court doctrine" made clear that government officials could not discriminate against certain kinds of speech).  Similarly, in

---

[12]   In *Estate of Phillips v. District of Columbia*, 455 F.3d 397 (D.C. Cir. 2006), firefighters injured in a fire brought a § 1983 action against their supervisor but on appeal their claims were thrown out based on qualified immunity.  But this case actually supports Plaintiffs' position on that defense.  First, the plaintiffs in that case had no evidence of egregious misconduct and instead fell back on a "failure to train" theory which has been unanimously rejected around the country as a basis for a § 1983 claim.  *Id.* at 406-07.  Here, unlike *Phillips*, there is a plethora of egregious misconduct alleged even at the pleading stage.  Second, this decision—even while favorable to the defense under its facts—highlights and gives notice that firefighting supervisors *could* be liable for § 1983 violations under different facts such as those here.  This only further "clearly established" the state-created danger case law in the Ninth Circuit such that Defendants Hall and Shumate knew or should have known that their conduct was unreasonable and in violation of the Hotshots' and their loved ones' constitutional rights.

*Mendoza*, the law that was clearly established was the general prohibition on the use of excessive force, not the precise case law "addressing the use of dogs to locate fleeing suspects."[13]  27 F.3d at 1361-62 ("An officer is not entitled to qualified immunity on the grounds that the law is not clearly established every time a novel method is used to inflict injury.").

Defendants Hall and Shumate violated fundamental firefighting principles,[14] Arizona law, and Forestry Division policies and procedures in creating and aggravating the deadly dangers to the Hotshots.  Independent state agencies have found that these actions were willful and serious, and that those willful serious violations of these principles, statutes, policies, and procedures caused the Hotshots' deaths.  In light of these affirmative, unconstitutional actions, Defendants Hall and Shumate are not eligible for qualified immunity and the State Defendants' motion must be denied.

### 4.    Plaintiffs Can Recover for the Violations of Their Loved Ones' Constitutional Rights

Plaintiffs bring this claim both on their own behalf, as statutory plaintiffs under Arizona wrongful death law on behalf of themselves and all other statutory beneficiaries of the decedents, and on behalf of the estates of the decedents themselves.  The State

---

[13]   The State Defendants cite to *Mattos v. Agarano*, 661 F.3d 433 (2011), for support, but like many of their cases it not only was decided on summary judgment (not the pleadings) it actually favors Plaintiffs' position.  *Mattos* was an excessive force case (actually two combined cases with parallel facts) involving split-second reactions to the suspect by arresting officers.  *Id.* at 436-39.  Under those circumstances, what is reasonable conduct is highly subjective and fact-specific.  *Id.* at 442 (noting that Fourth Amendment § 1983 cases are "always a very fact-specific inquiry" and that police officers are "forced to make split-second judgments" about the amount of force necessary in those situations).  That is not this case; Defendants Hall and Shumate had ample time to consider their actions, but despite the known and obvious risks—and despite Arizona law and firefighting protocols requiring actions to the contrary—continued in their course of reckless conduct.

[14]   *See* Am. Compl. ¶ 77 and Exh. B (discussing "10 standard firefighting orders" and "18 Watch Out Situations" promulgated by U.S. Forest Service and how Defendants violated those principles).

Defendants appear to acknowledge that the former is proper, *see Curnow ex rel. Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991) ("The Ninth Circuit recognizes that a parent has a constitutionally protected interest . . . in the companionship and society of his or her child . . . ."), and that the scope of who can recover should be defined by Arizona wrongful death law, *see Gotbaum v. City of Phoenix*, 617 F. Supp. 2d. 878, 882-83 (D. Ariz. 2008) (holding that remedies for § 1983 violation can be found in Arizona wrongful death law).  To the extent that *Gotbaum*, other Ninth Circuit case law, and the Arizona survival statute can be read to require the personal representative of the estate to bring a claim on behalf of the decedent, in this case that exalts form over substance. Almost all (if not all) of the Plaintiffs in this action are also entitled to appointment as personal representatives of their husband's or son's estate, and so Plaintiffs could clarify those roles with some modest amendments to the caption and pleadings in the Complaint. To the extent necessary, Plaintiffs request leave under Rule 15 to make those amendments to clarify that the § 1983 claims are brought on behalf of the decedents' estates as well as on behalf of their loved ones.

      **C.**      **The State Cannot Avail Itself of the Workers' Compensation Exclusive Remedy Provisions[15]**

---

[15]  The State argues, Motion at 13, that Plaintiffs' acceptance of workers' compensation benefits waives any opportunity to assert exceptions to the workers' compensation exclusive remedy provisions.  This argument is flawed in a number of respects. First, all workers' compensation benefits were paid by the City of Prescott and its insurer, not the State.  *See, e.g.*, Industrial Commission Division Upon Hearing and Findings and Award re Average Monthly Wage re William Warneke, Ex. D (noting that employer is City of Prescott and workers' compensation benefits are paid by the City's insurance carrier). Second, as described below, the State was not Plaintiffs' decedents' employer.  Third, even if payment of workers' compensation benefits by the City of Prescott somehow inured to the benefit of the State, not all Plaintiffs received workers' compensation benefits.  *See, id.* at 4 (workers' compensation wage awards made for only 11 of 19 Hotshot crew members).  For example, several Plaintiffs are surviving parents of the decedents who were not dependent upon their children.  Those Plaintiffs are not entitled to

1

**1.    The IGA Does Not Bar Plaintiffs' Claims**

2

The State argues that it became the employer of Plaintiffs' decedents under a

3

purported IGA with Prescott.  While there is an IGA between the State and the City of

4

Prescott, it is invalid because the City Council action purporting to approve the IGA

5

(Resolution No. 2952) does not comply with A.R.S. § 11-952(F), which states:

6

> Appropriate action by ordinance or resolution or otherwise pursuant to the laws applicable to the governing bodies of the participating agencies approving or extending the duration of the agreement or contract shall be necessary before any such agreement, contract or extension may be filed or become effective.

7

8

9

"Resolution No. 2952" (attached to the State Defendants' Motion) does not

10

approve or extend the purported IGA's duration.  As a result, under A.R.S. § 11-952(F),

11

the IGA could not "be filed or become effective."  Since the purported IGA could not be

12

filed or be effective, Plaintiffs' decedents never became the State's employees.  And

13

A.R.S. § 23-1022(A)'s "exclusive remedy" immunity cannot bar this lawsuit.

14

The State may argue that the crucial phrase "approving or extending the duration of

15

the agreement" should be read to say "approving, or extending the duration of, the

16

agreement."  But the absence of those two commas in the statute is critical.  Without the

17

commas, the phrase really means "approving the duration of the agreement or extending

18

the duration of the agreement."

19

Grammatically, the words "approving" and "extending" must modify "duration of

20

the agreement."  "Resolution No. 2952" lacks any approval or any extension of the

21

purported IGA's duration.  Because of that, "Resolution No. 2952" fails to comply with

22

A.M. § 11-952(F), and the IGA legally could not be filed or become effective.  The IGA

23

is therefore a nullity.

24

25

workers' compensation benefits, *see* A.R.S. § 23-1046(A)(4), and did not receive them.

26

The State has presented no evidence that Plaintiffs' received workers' compensation

27

benefits from any source, let alone that *all*  Plaintiffs received such benefits.

28

The absence of a comma can utterly transform a statute.  For example, in the recent Arizona Supreme Court case *Estate of Braden ex rel. Gabaldon v. State*, 228 Ariz. 323, 326 ¶ 12, 266 P.3d 349, 352 ¶ 12 (2011), the absence of a comma between "labor union" and "or other legal entity" in the phrase "labor union or other legal entity," meant that the State was not liable under the Arizona Adult Protective Services Act.  The absence of the two commas in the phrase "approving or extending the duration of the agreement" in A.R.S. § 11-952(F) is just as dramatic: it means that the IGA is void and ineffective.  Thus, A.R.S. § 23-1022(A)'s "exclusive remedy" can *only* apply to the City of Prescott.  It cannot apply to the State.

The State may argue that by purporting to approve the entire IGA, Prescott was necessarily approving the duration language of "will continue in force from year to year" that appears at the end of the State's boilerplate IGA form.  But that would eviscerate A.R.S. § 11-952(F), which requires a specific "appropriate action" by ordinance, resolution, or the like "approving or extending the duration of the agreement."  *See Williams v. Thude*, 188 Ariz. 257, 259, 934 P.2d 1349, 1351 (1997) (holding that each word, phrase, clause, and sentence of a statute must be given meaning so no part will be void, inert, redundant, or trivial).

Moreover, A.R.S. § 11-952(A) already specifically deals with overall approval of the IGA by the legislative or other governing body.  A.R.S. § 11-952(F) is a separate, essential statutory step that Prescott had to take—*but failed to take*—to make the purported IGA effective.  A.R.S. § 11-952(F) must be given effect and cannot be ignored or rendered redundant.  *See, e.g., State ex rel. Horne v. AutoZone, Inc.*, 229 Ariz. 358, 362 ¶ 18, 275 P.3d 1278, 1282 ¶ 18 (2010) ("We do not interpret statutes so as to render any

1    provision redundant.").  Since Prescott failed to comply with A.R.S. § 11-952(F), the

2    purported IGA could not be filed and is not effective.[16]

3         Further, when, as here, a statute's words "are plain and unambiguous, courts will

4    not go outside the language itself for interpretation."  *Emp. Sec. Cowen of Ariz. v. Fish*, 92

5    Ariz. 140, 142, 375 P.2d 20, 22 (1962).  In the *Estate of Braden* opinion discussed above,

6    the Arizona Supreme Court emphasized that:  "'When the plain text of a statute is clear

7    and unambiguous there is no need to resort to other methods of statutory interpretation to

8    determine the legislature's intent because its intent is readily discernable from the face of

9    the statute.'"  *Estate of Braden*, 228 Ariz. at 325 ¶ 8, 266 P.3d at 622 ¶ 8 (quoting *State v.*

10   *Christian*, 205 Ariz. 64, 66 ¶ 6, 66 P.3d 1241, 1243 ¶ 6 (2003)).  Under A.R.S. § 11-

11   952(F)'s clear and unambiguous words, the City of Prescott never approved the purported

12   IGA's duration or extended the purported IGA's duration.  As a result, the purported IGA

13   could not be filed and never became effective—and Plaintiffs' claims are not barred by

14   the workers' compensation exclusive remedy provisions.

15        The IGA is also invalid due to its failure to specify the "manner of financing the

16   joint or cooperative undertaking and of establishing and maintaining a budget for the

17   undertaking."  A.R.S. § 11-952(B)(3).  While the IGA refers to reimbursement for

18   equipment and manpower, it says nothing about the budget for such projects, let alone

19   how such a budget would be maintained.

20        An IGA is an important document affecting the legal and financial rights:  (1) of

21   the State, (2) of the public entity with which the State is trying to make the IGA, and (3)

22   of that public entity's employees and their families.  To protect all parties, an IGA must

23   comply strictly with its enabling statute—with A.R.S. § 11-952.  The point of a separate

24   action approving or extending an IGA's duration is to require a public entity to set a

_____

26   [16] The State argues that Plaintiffs lack standing to contest the IGA.  Not so.  The IGA is
27   not effective, so it is a legal nullity and cannot bind anyone.

specific time limit for the proposed IGA, so that parties are not bound to an unfairly long duration.  Similarly, the budgeting requirement allows the parties to plan and commit resources necessary for the project; without budget information, the Cooperator cannot know what would be required of it resource-wise and plan accordingly.  Arizona's Legislature has underscored the importance of allowing public utilities to understand their financial responsibilities and liabilities, and § 11-952(B)(3) flows from this concern.  *See, e.g., Johnson v. Superior Court*, 158 Ariz. 507, 508, 763 P.2d 1382, 1383 (App. 1988) (noting that the purpose of Arizona's notice of claim statute is to assist the entity in budgeting and financial planning).

Compliance with the IGA statute is essential.  If an agreement is going to divest 12 families of their right to compensation for the wrongful death of their sons, fathers and husbands, that agreement must meet the letter of the law.  The IGA does not.

In addition, there are factual questions precluding dismissal at this stage. For example, evidence controverts whether the IGA—even if it were effective—provided the State Defendants necessary control over the GMIH.  The GMIH was a "national resource" and was "statused and assigned through the National Interagency Coordination Center." Standards for Interagency Hotshot Crew Operations, Ex. E, at 4.  Adherence to these national standard is mandatory for the GMIH to maintain its federal Type One crew status. The GMIH did not become a Type One crew until 2008.  *See* Reporter's Transcript of Proceedings, *In re Andrew Ashcraft*, Ex. F, Testimony of (ret.) City of Prescott Firefighter Todd Rhines at 53.  That there was an IGA executed in 1997—over ten years before the GMIH was formed and subjected to federal requirements and duties—does not mean that the IGA gave the State control over the crew's actions.  Plaintiffs are at least entitled to depose the Incident Command Team, Chief Willis, and Interagency Hotshot operations authorities on the chain of command and respective rights, if any, to control crew operations.

**2.     The State Cannot Avail Itself of an Agreement it Breached**

Plaintiffs have also alleged that the State materially breached the IGA, voiding any performance obligations it might theoretically confer.  *See* Am. Compl. ¶¶ 66-72.  This breach includes failing to provide organization required at page 1, paragraph 1of the IGA (including failing to staff critical positions such as Safety Officer).  This evidence must be assumed true for the purposes of the Motion, and excuses the non-breaching party from performing under the contract.  *See Dialog4 Sys. Eng'g GmbH v. Circuit Research Labs, Inc.*, 622 F. Supp. 2d 814, 820 (D. Ariz. 2009).  Contrary to the State's claim, Plaintiffs have standing to challenge the effect of the (invalid and breached) IGA under the unique circumstances of this case.  When a party with standing is unable to assert their rights, as the Hotshots here, surrogates may assert the rights of third parties.  *See e.g.,Wauchope v. U.S. Dep't of State*, 756 F. Supp. 1277, 1280-81 (N.D. Cal. 1991) *aff'd*, 985 F.2d 1407 (9th Cir. 1993) ("[T]his case presents an appropriate occasion for permitting a plaintiff to serve as a surrogate in asserting the rights of a third party.); *Irving v. Clark,* 758 F.2d 1260 (8th Cir.1985) (child of deceased landowner permitted to assert landowner's Fifth Amendment just compensation claim).[17]

### 3.   The State's Contention That It Is *Not* an Employer of Decedents Creates a Question of Fact

The State Forester is currently in litigation with ADOSH arising from ADOSH's imposition of criminal penalties for the State's "Willful Serious" violation of workplace safety laws and duties.  *See* Ex. B.  In that proceeding—which arises from the exact same facts as this lawsuit—the State is taking the position that it is *not* the decedent's employer.  For example, on September 12, 2014, ADOSH lodged a copy of the State's motion to

---

[17] The Supreme Court of the United States issues a similar holding in a case analogous to *Irving*, finding, "Thus far, we have permitted third-party standing only where more "daunting" barriers deterred the rightholder. *Powers v. Ohio,* 499 U.S. 400, 414 (1991); *see also Hodel v. Irving,* 481 U.S. 704 (1987) (concluding that plaintiffs had third-party standing to assert the rights of their deceased parents).

dismiss Plaintiffs' original complaint and argued that it estopped the State from denying

its status as an employer in the Industrial Commission matter (which Plaintiffs here

contest as well).  In response, the State vigorously opposed any effort to curtail its legal

position that it was not the Hotshots' employer and subject to ADOSH liability.  *See*

Response to ADOSH's Submission of Exhibit re Alleged Estoppel, Ex. G.

The State's admission that it is not a "controlling employer" in the ADOSH matter

is fatal to its worker's compensation bar defense here.  *See id.* at 4; *Garcia v. City of South

Tucson*, 131 Ariz. 315, 318, 640 P.2d 1117, 1120 (App. 1981) (noting that alleged

"employer" had "no control over the method used by the [alleged employee] to

accomplish the desired result and was therefore not a statutory employer [pursuant to an

intergovernmental agreement]").

### 4.     The GMIH Were not Lent Employees Employed by the State

The State's argument that the "lent employee" doctrine bars Plaintiffs' claims is

equally unfounded.  While the State correctly cites to the *Word v. Motorola, Inc.*, 135

Ariz. 517, 662 P.2d 1024 (1983), three-part test,[18] it incorrectly leaps to the conclusion

that "it is abundantly clear that the three [*Word*] factors are met here.

To demonstrate application of a special employer relationship and corresponding

immunity, the State must establish that there is a contract for hire between the Hotshots

and the State.  The State alleges no such contract, because there is none.[19]

_____

[18]  A lent employee has become the employee of a special employer—providing
immunity from civil suit to the special employer—only if "(a) the employee has made a
contract of hire, express or implied, with the special employer; (b) the work being done is
essentially that of the special employer; and (c) the special employer has the right to
control the details of the work."  *Word*, 135 Ariz. at 520, 662 P.2d at 1027.
[19]  This is not a situation like *Callan v. Bernini*, 213 Ariz. 257, 261-62, 141 P.3d 737,
741-42 (App. 2006), where there was a valid and binding IGA that served as an
employment contract.

The importance of an express or implied contract for hire is a necessity, "since the employee loses certain rights along with those he gains when he strikes up a new employment relation." *Id.* at 519, 662 P.2d at 1026. The State has failed to establish any agreement between Plaintiffs' decedents and the State and without such evidence there is no special employer immunity.

Similarly, the State's right to control the GMIH, if any, would arise from the IGA.[20] Since the IGA is defective, the State had no right to control GMIH. In addition, as described above, the GMIH was acting as a municipal fire crew department subject to the requirements of the federal Interagency Hotshot Crew requirements. Among these requirements is that the crew serve as a "nationally-available, twenty person hand crew within the Incident Command System" and is "a national shared resource, statused and assigned through the National Interagency Coordination Center." Ex. E at 4. If GMIH were tasked subject to federal needs and assigned via federal channels, and the IGA is invalid, how can the State have the right to control GMIH work? These questions must be answered by the trier of fact, or at least through some modest discovery.

Finally, the State has stated in ADOSH matters that it was not a "controlling employer" and is estopped from taking a contrary position here. *See* Ex. G at 4.

**5.      Questions of Fact About the "Willfulness" of the State's Misconduct Preclude Dismissal[21]**

  **a.      The State's "willful misconduct" caused Plaintiffs' decedents' deaths.**

---

[20]   Plaintiffs acknowledge that suppressing fire on State lands is "essentially" work of the State's Forester.

[21]   The State also argues that the only persons able to opt out of workers' compensation benefits are the employees themselves. *See* Motion at 13-14. Plaintiffs agree with this proposition and do not argue that they can opt out of workers' compensation benefits. But this is irrelevant since the State did not provide workers' compensation benefits and was not the employer of Plaintiffs' decedents.

Even if the purported IGA were valid—which it is not—under A.R.S. § 23-1022(A), if an employer's willful misconduct causes the injury, and the misconduct indicates willful disregard of the employee's life, limb or bodily safety, "the injured employee may either claim compensation or maintain an action at law for damages against the person or entity alleged to have engaged in the willful misconduct" A.R.S. § 23-1022(B) states that:  "'Willful misconduct' as used in this section means an act done knowingly and purposely with the direct object of injuring another.'"

As discussed above, an independent *state* agency, ADOSH, cited and substantially fined the State on December 5, 2013.  Ex. B.  ADOSH specifically found that, during the Yarnell Fire, the State committed "Willful Serious" misconduct that killed 19 members of the Granite Mountain Interagency Hotshot Crew.  *Id.*

ADOSH made its "willful misconduct" administrative ruling after an investigation and after giving the State an opportunity to present its own evidence and arguments.  An adjudicative determination by an administrative tribunal is entitled to the same res judicata effect as a court's judgment if it contains the essential elements of a judicial adjudication. *A. Miner Contracting Inc. v. Toho-Tolani County Imp. Dist.*, 233 Ariz. 249, 255 16, 311 P.3d 1062, 1068 16 (App. 2013) (citing *Restatement (Second) of Judgments* § 83(2) (1982)).

ADOSH settled the issue when it found the State committed willful misconduct against the GMIH members.  As a result, even if the State were considered an employer, under A.R.S. § 23-1022(A), Plaintiffs may reject workers' compensation and "may maintain an action at law for damages against the person or entity alleged to have engaged in the willful misconduct."

### b.      Whether the State Committed "Willful Misconduct" is a Fact Question

Even if the purported IGA were valid—which it is not—A.R.S. § 23-1022(B) provides that:  "'Willful misconduct' as used in this section means an act done knowingly

27

and purposely with the direct object of injuring another."  The statute thus requires

determining the intent of the State officers in charge of suppressing the Yarnell Hill Fire.

The jury decides the existence of intent, which need not be established by direct proof,

and which the jury may determine and infer from all the facts and evidence.  *See Harris v.

Itzhaki*, 183 F.3d 1043, 1051 (9th Cir. 1999) ("Issues of credibility, including questions of

intent, should be left to the jury."); *State v. Quatsling*, 24 Ariz. App. 105, 536 P2d 226

(1975)(same).

Courts have repeatedly recognized that a defendant's "mental state must

necessarily be ascertained by inference from all relevant surrounding circumstances."  *In

re William G.*, 192 Ariz. 208, 213, 963 P.2d 287, 292 (App. 1997).  A person acts with

intent to produce a certain consequence if "the person acts knowing that the consequence

is substantially certain to follow."  *Restatement (Third) of Torts:  Liability for Physical

and Emotional Harm* § 1(b) (2010).  Here, a reasonable jury could find intent to injure

based on the same facts outlined in Section II(B)(2), *supra*.[22]

### D.  The Fireman's Rule Is Not Applicable to Plaintiffs' Independent Negligence Claims Against the State Defendants

The State Defendants next argue that Plaintiffs' claims are barred under the

Firefighter's Rule.  This argument also fails.

Arizona Courts have adopted the "Fireman's Rule" or "Firefighter's Rule."  The

Firefighter's Rule "negates liability to a fireman by one whose negligence causes or

contributes to the fire which in turn causes the death or injury of a fireman."  *Garcia*, 131

Ariz. at 318, 640 P.2d at 1120; *Read v. Keyfauver*, 233 Ariz. 32, 35 ¶ 8, 308 P.3d 1183,

1186 (App. 2013).  However, the Firefighter's Rule is an exception to the general rule of

---

[22] Some facts, viewed in isolation, may suggest only gross negligence.  But the enormity of all these failings, and the egregiousness of the conduct on a collective basis, further supports a jury question on the issue of "willfulness."  *In re William G.*, 192 Ariz. at 213, 963 P.2d at 292.

28

liability under the Rescue Doctrine and Arizona courts have recognized that it is to be narrowly construed.  *See Read*, 233 Ariz. at 36 ¶ 11, 308 P.3d at 1187; *Espinoza v. Schulenburg*, 212 Ariz. 215, 218, ¶ 17, 129 P.3d 937, 940 (2006).  Because of its deliberately narrow construction, courts have recognized several exceptions to the Firefighter's Rule.  Plaintiffs' claims in this case fits within one recognized exception to the Firefighter's Rule—when "independent negligence" of a third party causes the public safety professional's injury, the rule isn't inapplicable.  *Read*, 233 Ariz. at 36, ¶ 11, 308 P.3d at 1187; *Garcia*, 131 Ariz. at 319, 640 P.2d at 1121.

Arizona Courts first recognized the "independent negligence" exception to the Firefighter's Rule in *Garcia*.  In that case, the court analyzed whether police officers[23] claims against a police officer from another department were barred by the Firefighter's Rule.  131 Ariz. at 317-18; 640 P.2d at 1119-20.  The Court examined the purpose and effect of the Firefighter's Rule but concluded it was inapplicable to that case because, while the police officer was responding to an emergency call, the police officer's injury was caused by the independent negligence of a sergeant in control from another police department who ordered "an assault without warning" in response to issue and call to which the Tucson Fire Department officer responded.  *Id*. at 319, 640 P.2d at 1121.

Here, the Firefighter's Rule does not apply because Plaintiffs are not seeking compensation from the State Defendants because they started the fire.  Indeed, the Yarnell Fire was started by a lightning strike for which no jural entity can be held responsible. *See* Am. Compl. ¶ 37.  In other words, the State Defendants neither caused nor contributed to the cause of the fire which claimed the death of the 12 Granite Mountain Hotshot members who left behind Plaintiffs.  Instead, Plaintiffs' cause of action against the State Defendants is based upon the State Defendants' independent negligence in the management of that fire, failure to suppress the fire, and failure to evacuate Plaintiffs'

---

[23]  The "Firefighter's Rule" also applies to police officers.

decedents from the fire.  As in the *Garcia* case, defendants did not create the situation requiring Plaintiffs' decedents to respond and perform their duties.  But Defendants' independent negligence created and aggravated a dangerous situation that ultimately caused the death of Plaintiffs' decedents.

Under these circumstances, the independent negligence exception to the Firefighter's Rule precludes its application and Defendants' Motion to Dismiss on this theory must be denied.

### E.     The Court Should Defer Decision on the Motion and Allow Time for Limited Discovery Under Rule 56(d)

As described above, the State Defendants' motion is nominally filed under Rule 12(b), but by attaching documents and evidence, the Motion is construed under Rule 56.  The State Defendants also improperly ask the Court to find many factual issues in their favor under the guise of qualified immunity and the federal pleading standard.[24]

As set forth in the Affidavit of Shannon Clark, Ex. H, the Court should delay adjudication of the Motion to Dismiss for at least 120 days so that Plaintiffs may obtain depositions from State employees and non-parties to necessary to allow fuller presentation of the evidence on the willful conduct of State employee, determination of whether the State's position in the ADOSH matter estops it from asserting a contrary position in this case and whether facts demonstrate the viability of the State's qualified immunity defense.  Given the approaching holiday season, Plaintiffs anticipate that 120 days would allow for the limited depositions and discovery referenced in the Clark Affidavit.  This request is particularly appropriate here, where the disputed issues are factual in nature, the Amended Complaint was recently filed, and there has been no discovery whatsoever.

---

[24]   Tellingly, the overwhelming majority of the cases cited by the State Defendants in support of qualified immunity arose out of summary judgment dispositions or jury verdicts not Rule 12(b)(6) motions.

III.   **CONCLUSION**

Factual questions preclude summary judgment on Plaintiffs' Section 1983 claims. The 12 men who died leaving Plaintiffs and their children behind were employees of the City of Prescott.  Factual issues regarding the enforceability and validity of the Intergovernmental Agreement between the State and the City of Prescott—as well what happened during the fire—preclude the State's Motion to Dismiss on the basis of the workers' compensation exclusive remedy provisions.  Plaintiffs do not sue the State for causing the fire, so the Firefighter's Rule does not bar Plaintiffs' claims in this case.

For these reasons, Defendants' Motion to Dismiss must be denied.

RESPECTFULLY SUBMITTED this 26th day of November, 2014.

GALLAGHER & KENNEDY, P.A.


By: */s/* Shannon L. Clark _____
Patrick J. McGroder III
Shannon L. Clark
Lincoln Combs
Caroline E. McGroder
2575 East Camelback Road
Phoenix, Arizona  85016-9225
Attorneys for Plaintiffs

**CERTIFICATE OF SERVICE**

I hereby certify that on the 26th day of November, 2014, I electronically transmitted the attached document to the Clerk of the Court using the CM/ECF System for filing; Copy emailed to Judge Tuchi at tuchi_chambers@azd.uscourts.gov; transmittal of a Notice of Electronic Filing to the following CM/ECF registrants: Copies mailed to the following CM/ECF registrants:

Thomas C. Horne
Attorney General
Brock Heathcotte (014466)
Assistant Attorney General
125 West Washington
Phoenix, Arizona  85007
DefensePhx@azag.gov
Brock.Heathcotte.azag.gov
*Attorneys for State Defendants*

Michael L. Parrish (015956)
STINSON LEONARD STREET, LLP
1850 North Central Avenue, Suite2100
Phoenix, Arizona  85004
mparrish@stinson.com
*Attorneys for State Defendants*

Georgia A. Staton
Jones, Skelton & Hochuli, P.L.C.
2901 North Central Avenue, Suite 800
Phoenix, Arizona  85012
Email: Gstaton@JSHFIRM.com
*Attorneys for Defendant County of Yavapai*

Anthony Hancock
Beaugureau Hancock Stoll & Schwartz PC
302 East Coronado Road
Phoenix, Arizona  85004
Email: ajh@bhsslaw.com
*Attorneys for Defendants Central Yavapai*
*Fire District and Abel*

Thomas K. Kelly
THOMAS K. KELLY, P.C.
425 East Gurley
Prescott, Arizona  86301
*Attorneys for Plaintiffs*

 */s/* Roberta L. Schmidt

4401287v3/24742-0001

32